# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jesus Reyes,<br><br>        Plaintiff,<br><br>v.<br><br>Carolyn Colvin, Acting Commissioner of<br>Social Security Administration,<br><br>        Defendant. | Case No. 14-cv-00083 (DWF/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

Mark M. Walbran, Walbran & Furness, P.O. Box 273, Owatonna, MN 55060, for Plaintiff.

Ann M. Bildtsen, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Defendant.

HILDY BOWBEER, United States Magistrate Judge

## I.    Introduction

Plaintiff Jesus Reyes seeks judicial review of the denial of his applications for Social Security supplemental security income and disability insurance benefits. This matter is before the Court on the parties' cross-motions for summary judgment. (Pl.'s Mot. Summ. J. [Doc. No. 11]; Def.'s Mot. Summ. J. [Doc. No. 18].) This matter has been referred to the undersigned United States Magistrate Judge for Report and Recommendation under 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends granting in part and

denying in part Plaintiff's motion; granting in part and denying in part Defendant's motion; and remanding the case to determine (a) the date on which medical improvement occurred, and with respect to which impairments, and (b) whether, and if so, to what extent Plaintiff became disabled again after medical improvement occurred.

## II.   Background

### A.   Procedural History

On September 27, 2010, Plaintiff filed applications for disability insurance benefits and supplemental security income, alleging a disability onset date of August 23, 2008.  (R. 142, 149.)[1]  The Social Security Administration ("SSA") denied Plaintiff's claims initially and upon reconsideration.  (R. 84, 91.)  After an administrative hearing on June 18, 2012, the administrative law judge ("ALJ") issued a partially favorable decision, finding that Plaintiff was disabled from August 23, 2008 through August 24, 2009, but his disability ended on August 25, 2009.  (R. 18-19.)  Plaintiff sought review of the ALJ's decision, and the Appeals Council denied review on November 15, 2013.  (R. 1, 258-75.)  On January 9, 2014, Plaintiff filed this action.  (Compl. [Doc. No. 1].)

### B.   Factual History and Past Employment

Plaintiff was born in 1970 and completed two years of college.  (R. 142, 172.)  He last worked as a grinder/filer in aluminum castings in May 2007, and previously worked as a machine operator in meat packaging.  (R. 179.)  Plaintiff alleges disability based on his multiple leg fractures, obesity, anxiety, tuberous sclerosis, depression, pressure headaches, and arthritis in the right elbow.  (R. 171.)

---

[1]  The Social Security Administrative Record ("R.") is available at Doc. No. 8.

On October 3, 2010, Plaintiff completed a function report for the SSA.  (R. 187-94.)  At that time, Plaintiff's activities included maintaining his personal hygiene, eating meals, helping his wife make supper, watching television, and helping his children with homework.  (R. 188.)  He played card games with others and attended church weekly.  (R. 191.)  Plaintiff indicated that his conditions affected his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks.  (R. 192.)  His abilities to talk, hear, see, remember, concentrate, understand, follow instructions, use his hands, and get along with others, however, were unaffected.  (R. 192.)

### C.   Medical Records

#### 1.   Physical Impairments

##### a.   Bodily Pain

On January 22, 2001, Plaintiff reported a recurrent headache to Sean Pittock, M.D., as well as some mid-back pain.  (R. 714.)  Dr. Pittock prescribed medication for the headache and performed an MRI of Plaintiff's cervicothoracic spine, which revealed no abnormality.  (R. 714.)  During the follow-up visit on March 5, 2001, Dr. Pittock recommended weight loss and exercise for Plaintiff's back pain, and noted the normal results of the neurologic exam.  (R. 714.)

In the fall of 2005, Plaintiff reported a back injury from July 7, 2005, to Lonnie Berger, M.D.  (R. 752.)  Dr. Berger diagnosed him with lumbar strain, and recommended a home exercise program and physical therapy.  (R. 752.)  After nine physical therapy sessions, Plaintiff reported "90-95% improvement."  (R. 746.)

On August 23, 2008, Plaintiff arrived at the Valley Baptist Medical Center in

Brownsdale, Texas, with lower-body injuries from being "hit with a bat multiple times" while in Mexico.  (R. 279.)  Plaintiff's left leg was splinted, and his right knee was immobilized.  (R. 283-84.)  Four days later, Plaintiff visited the Albert Lea Medical Center, in Albert Lea, Minnesota, where he was diagnosed with a right ankle fracture, a left medial malleolar fracture, and soft tissue contusion through the bilateral lower extremities.  (R. 335-36.)  He informed medical staff about his assault in Mexico: several men robbed him, stole his truck, made him lie on the ground, beat his legs with wood or bats, and ran over his legs with a pickup truck several times.  (R. 335.)  Plaintiff rated his pain as a six on a ten-point scale.  (R. 335.)

On September 4, 2008, Plaintiff underwent surgery for his legs with Mark Ciota, M.D.  (R. 345.)  Notes from post-operative visits show that Plaintiff felt he was improving, had a "marked decrease in pain" in November 2008, and continued to make "slow, steady progress" in late December 2008.  (R. 368, 375, 383.)

On March 30, 2009, Plaintiff reported pain in his legs, which Dr. Ciota believed was soft tissue irritation.  (R. 387.)  On April 29, 2009, Dr. Ciota noted that x-rays showed complete healing of Plaintiff's bones and fractures, and therapy had mitigated his pain in the peroneal tendons, above his right ankle, and the plantar fascia of his left foot.  (R. 391.)  On May 14, 2009, several screws were removed from Plaintiff's right ankle, and Plaintiff received an injection in his left foot.  (R. 397.)  On June 1, 2009, however, Dr. Ciota noted that the injection appeared not to have helped, and that "medication, therapy, [and] time" had not alleviated his symptoms.  (R. 398.)  Thus, Dr. Ciota recommended obtaining MRIs.  (R. 398.)  On July 28, 2009, Dr. Ciota reviewed the MRI

results with Plaintiff: the right knee "really look[ed] excellent," and while the left knee showed no abnormality, there was "quite a bit of swelling."  (R. 413.)  Dr. Ciota prescribed Toradol for the effusion and thought Plaintiff might benefit from aspiration and injection.  (R. 413.)

In July 2009, Plaintiff was fitted with an orthotic and ambulated in the clinic of Roy Buckmaster, D.P.M., without complaint.  (R. 411.)

On August 31, 2009, Dr. Ciota noted that Plaintiff's "swelling is down but his pain remains constant."  (R. 415.)  Plaintiff rated his pain as a two out of ten.  (R. 416.) Dr. Ciota aspirated slightly bloody joint fluid and injected Depo Medrol into Plaintiff's joint.  (R. 415.)  Plaintiff returned over a year later, on October 11, 2010, reporting symptoms in both legs, calf pain, lateral leg pain, ankle pain, and medial knee pain on the right side.  (R. 511.)  Dr. Ciota noted that Plaintiff also developed overuse syndrome with his elbow and had epicondylitis, likely related to his cane use.  (R. 511.)  Plaintiff inquired about obtaining disability benefits, and Dr. Ciota replied that Plaintiff needed to visit a physician specializing in disability evaluation.  (R. 511.)

On October 28, 2010, Plaintiff visited Edward Shaman, M.D., where he reported increasing lower limb pain and the inability to stand for a long time.  (R. 551.)  Returning on November 23, 2010, Plaintiff reported his generalized aches and pains, inability to stand for a long time, and arm pain from epicondylitis.  (R. 555.)

On November 2, 2010, state agency medical consultant Gregory Salmi, M.D., reviewed Plaintiff's medical records and completed a physical residual functional capacity ("RFC") assessment form regarding Plaintiff's physical abilities.  (R. 542-49.)

He found that Plaintiff could occasionally lift ten pounds, frequently lift twenty-five pounds, stand or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push and pull with limitations in the lower extremities. (R. 543.)  Dr. Salmi found Plaintiff's statements about the effect of his impairments on his functioning to be consistent with the medical and non-medical evidence.[2]  (R. 547.)

On February 21, 2011, Plaintiff saw Douglas Edwards, D.C., for his back, hip, buttock, and thoracic pain.  (R. 699.)  Over the next several weeks, Plaintiff underwent eleven treatments of conservative chiropractic care, conjunctive therapy, home exercise programming, and activity modification.  (R. 699.)  By April 2011, Plaintiff rated his pain as a one out of ten for all of his symptoms.  (R. 699.)

On February 14, 2012, Plaintiff returned to Dr. Shaman.  (R. 647.)  Plaintiff stated that his chronic low back pain had worsened and continued in the thoracic and mid-lumbar area.  (R. 647.)  Dr. Shaman noted that Plaintiff experienced discomfort when sitting or walking for a long time, but standing did not bother him as much.  (R. 647.)

On February 15, 2012, Plaintiff visited Eun Kim, M.D., for his left low back pain, posterior hip groin pain, and left scapular pain.  (R. 641.)  Dr. Kim's impressions included left low back pain, sacroiliac pain dysfunction, iliopsoas bursitis/tendonitis, bilateral knees and ankle pain, and traumatic arthritis.  (R. 644.)  Dr. Kim suggested physical therapy and injections, to which Plaintiff agreed.  (R. 644.)  Several days later,

---

[2]  On March 22, 2011, state agency medical consultant Steven Richards, M.D., reviewed all of the evidence in the file and affirmed the November 2, 2010, assessment.  (R. 601-03.)

6

Dr. Kim administered the injections.  (R. 636.)

On March 14, 2012, Plaintiff met with Gregory Deyak, L.P.T., who began a four-week plan of physical therapy for Plaintiff's back pain.  (R. 766.)  Plaintiff finished physical therapy on April 26, 2012.  (R. 766.)  Plaintiff met his goals for decreasing back pain by 25%, an independent exercise program for lower extremity and flexibility exercise, and lumbar stabilization.  (R. 766.)  But he did not meet his goal regarding neutral spine lifting techniques, and it was uncertain whether he met his long-term goals relating to neutral spine mechanics with transfers.  (R. 766.)

On March 29, 2012, Plaintiff returned to Dr. Kim, who noted that Plaintiff walked without limping or an assistive device, and his pain level was much improved.  (R. 760.)  Bending, however, aggravated Plaintiff's pain, and his sacroiliac area was mildly tender. (R. 760.)  Dr. Kim recommended that Plaintiff continue physical therapy, discontinue Flexeril, and take Vicodin for his leg pain.  (R. 761.)

On May 22, 2012, Plaintiff reported his back pain to Jeff Eaton, D.C., from lifting "something too heavy," as being a six on a ten-point scale.  (R. 770.)  Dr. Eaton performed a manual adjusting technique over all restricted vertebral segments, and noted that Plaintiff responded well to chiropractic therapy.  (R. 770.)

In a physical medical source statement dated June 13, 2012, Dr. Shaman estimated Plaintiff's functional limitations in a competitive work situation as follows: walk for less than one block without rest or severe pain; sit or stand for thirty minutes at a time; sit, stand, or walk less than two hours with normal breaks; be permitted to shift positions at will; walk every thirty minutes for ten to fifteen minutes each time; take unscheduled

breaks throughout the day; be free to elevate his legs; and use a cane.  (R. 774-75.)

Dr. Shaman opined that Plaintiff could twist, stoop, crouch, and squat occasionally, climb

stairs rarely, and never climb ladders.  (R. 775.)  He also opined that Plaintiff was likely

to be "off task" 25% or more of the time, incapable of "low stress" work, and likely be

absent from work more than four days per month due to his impairments.  (R. 775-76.)

### b.        Diabetes and Hypertension

During post-operative care in September 2008, Dr. Ciota noted Plaintiff's

hypertension and glucose intolerance, and initiated an insulin sliding scale and diabetic

diet.  (R. 347-48.)  On October 22, 2008, Dr. Shaman observed the distinct possibility

that Plaintiff might become diabetic should he not continue with his diet, weight, and

exercise.  (R. 373.)

In June and October 2009, Dr. Shaman noted Plaintiff's hypertension and that

Plaintiff presented no complaints in this regard.  (R. 401, 417.)

On November 18, 2009, Dr. Shaman believed that Plaintiff was now diabetic.

(R. 421.)  On April 29, 2010, Plaintiff followed up with Dr. Shaman about his diabetes,

reporting that he was taking his medications and watching his diet.  (R. 429.)

On October 28, 2010, Plaintiff met with Dr. Shaman for his diabetes and

hypertension.  (R. 551.)  Dr. Shaman increased Plaintiff's dosage of Metformin and

found the hypertension to be stable.  (R. 552.)

On February 14, 2012, Plaintiff informed Dr. Shaman that he was not complying

with his diabetes regimen.  (R. 647.)  Because his father was in hospice, Plaintiff was not

eating carefully.  (R. 647.)  Dr. Shaman discussed insulin with him, and offered to

continue Metformin and add Glucotrol.  (R. 648.)

### 2.    Mental Impairments

Plaintiff was first diagnosed with depression in August 2007.  (R. 320.)  On May 8, 2009, he went to urgent care for shortness of breath and anxiety, where he was diagnosed with a potential panic disorder and prescribed Xanax.  (R. 288-89.)  On May 11, 2009, Plaintiff visited Dr. Shaman and reported his visit to urgent care. (R. 393.)  Dr. Shaman noted that at urgent care, Plaintiff's complete cardiac workup results were within normal limits, and Plaintiff now reported feeling better.  (R. 393.) Plaintiff asked to start taking Zoloft, and Dr. Shaman agreed.  (R. 393.)

On June 8, 2009, Plaintiff visited Dr. Shaman, stating he felt better and his panic attacks were much lessened.  (R. 401.)  Although he had a panic attack about a week earlier, it was the first one in approximately six weeks, short-lived, and not nearly as bad. (R. 401.)  On July 23, 2009, Dr. Shaman noted that Plaintiff was "doing quite well" and did not have any panic attacks since taking Sertraline.  (R. 407.)  On October 28, 2009, Plaintiff reported that he had far fewer panic attacks, his agoraphobia was almost gone, and he had not experienced side effects to his medications.  (R. 417.)

On October 28, 2010, Plaintiff visited Dr. Shaman to address his anxiety concerns. (R. 551.)  He reported that once or twice in the last four to six weeks, he felt on the verge of having an anxiety attack.  (R. 551.)  Dr. Shaman noted Plaintiff's worsening panic attack/depression, and increased his dosage of Citalopram.  (R. 552.)  On November 23, 2010, Plaintiff saw Dr. Shaman about his continued anxiety.  (R. 555.)  He stated that at times, he felt like crashing his car into a wall, but ultimately would not do so out of

concern for his children.  (R. 555.)  Plaintiff continued to take Citalopram, and

Dr. Shaman prescribed Venlafaxine.  (R. 556.)

On February 5, 2011, Mark Kossman, Psy.D., L.P., issued a consultative

examination report based on his evaluation of Plaintiff the day earlier.  (R. 569-73.)

Dr. Kossman diagnosed Plaintiff with major depressive disorder, recurrent, with

psychotic features, and post-traumatic stress disorder, whose stressors included

unemployment, financial concerns, marital discord, and being a victim of a severe

physical assault.  (R. 573.)  Dr. Kossman stated that:

- Plaintiff could understand and follow simple instructions, but may have difficulty understanding and following complex directions due to his acute psychological symptoms;

- Plaintiff's ability to complete entry level job tasks with reasonable persistence and pace may be compromised by his anxiety and depressive symptoms;

- Plaintiff may be prone to exaggerating anxiety and depressive symptoms where he was expected to meet expectations and complete tasks within prescribed time limits;

- Plaintiff's attention and concentration appeared below average for his age;

- Plaintiff's ability to tolerate stress appeared limited;

- Plaintiff may be at risk for developing suicidal ideation under stress; and

- Plaintiff's ability to relate to co-workers and supervisors for brief and prolonged periods of time appeared marginal.

(R. 573.)

On March 19, 2011, state agency medical consultant Jeffrey Boyd, Ph.D., L.P.,

reviewed Plaintiff's medical records and completed a request for state agency consultant

advice regarding Plaintiff's mental condition, a psychiatric review technique form, and

mental RFC assessment.  (R. 580-99.)  Dr. Boyd found that Plaintiff had mild restriction

of activities in daily living; mild difficulties in maintaining social functioning; moderate

difficulties in maintaining concentration, persistence, or pace; and no episodes of

decompensation, each of extended duration.  (R. 593.)  According to Dr. Boyd, Plaintiff

had the RFC to:

- Concentrate on, understand, and remember routine, repetitive, and 3-4 step uncomplicated instructions, but this ability would be markedly impaired for detailed or complex/technical instructions;

- Carry out routine, repetitive, and 3-4 step tasks with adequate persistence and pace, but this ability would be markedly limited for detailed or complex/technical tasks;

- Handle brief and superficial contact with co-workers and the public;

- Cope with reasonably supportive supervisory styles that could be expected to be found in many customary work settings; and

- Handle stresses of a routine, repetitive, or 3-4 step work setting, but not stresses of a detailed or complex work setting.

(R. 599.)  Dr. Boyd did not give controlling weight to Dr. Kossman's consultative

examination, because there was evidence that Plaintiff was not fully credible in

describing his problems to Dr. Kossman,[3] Dr. Kossman's assessment of Plaintiff's level

of impairment was inconsistent with the rest of the medical record, and Dr. Kossman's

opinion was "somewhat equivocal and difficult to interpret."  (R. 595.)

---

[3]  Dr. Boyd found Plaintiff's statements regarding his symptoms and their effect on his functioning to be only partially credible, because Plaintiff's description of his assault in Mexico to the consultative examiner "varied dramatically from what he told ER staff shortly after the assault."  (R. 595, 599.)

On February 14, 2012, Plaintiff returned to Dr. Shaman for treatment of his depression, which had worsened since his father entered hospice.  (R. 647.)  Plaintiff also attributed his depression to his inability to find a job and perform sexually.  (R. 647.)  Dr. Shaman increased Plaintiff's dosage of Venlafaxine.  (R. 649.)  In a letter dated June 13, 2012, to Plaintiff's counsel at his request, Dr. Shaman opined that Plaintiff's depression and anxiety met or equaled Listings 12.04 or 12.06.  (R. 772.)

On March 20, 2012, Plaintiff visited Dr. Shaman, stating that he felt very depressed lately, his depression was "really getting out of hand," and the Citalopram helped his anxiety but not his depression.  (R. 618.)  Dr. Shaman did not change Plaintiff's medications but referred him to a psychiatrist, Karen Gosen, M.D.  (R. 619.)

On July 3, 2012, Dr. Gosen completed a mental impairment questionnaire, based on her initial interview of him the previous day.  (R. 801, 805-12.)  Dr. Gosen found the following categories to be extremely limited for Plaintiff: restriction of activities of daily living, difficulties in maintaining social functioning, and deficiencies of concentration, persistence, or pace.  (R. 803.)  She also found four or more repeated episodes of decompensation within a twelve-month period, each of extended duration.  (R. 803.)  Dr. Gosen believed the following showed the severity of Plaintiff's mental impairments:

> He rarely leaves his house, is not motivated, frequently scared and anxious.
> He is withdrawn from family, marital problems are occurring due to his
> failure to provide financially, sexually, or by meaningful interaction.

(R. 801.)  She noted that Plaintiff's depression increased his perception of pain, while his pain increased his depression.  (R. 803.)  Dr. Gosen further stated that Plaintiff would have difficulty working at a regular job on a sustained basis, because he "is very fearful

of people in general given past events." (R. 804.)

Dr. Gosen's final report recounted the history of Plaintiff's depression, as told to her by Plaintiff. (R. 805-07.) Dr. Gosen diagnosed Plaintiff with depression and post-traumatic stress disorder, and recommended continuing Celexa and starting Lamictal, with additional agents to follow. (R. 811.) Dr. Gosen noted Plaintiff's denial of any suicide attempts or hospitalizations for psychiatric reasons. (R. 807.) Dr. Gosen observed that Plaintiff was alert and oriented to person, place, and time. (R. 810.) She also found his functioning and memory intact, his abstract reasoning concrete, thought process coherent, and judgment age appropriate. (R. 810.)

On August 9, 2012, Dr. Gosen saw Plaintiff again. (R. 826.) In a letter dated September 25, 2012, to Plaintiff's counsel, Dr. Gosen opined that Plaintiff's ability to interact with others was extremely limited, and he struggled to follow instructions and execute plans. (R. 826-27.) Dr. Gosen stated that Plaintiff had progressed only mildly with medication and needed at least two more years before considering a return to the workplace. (R. 827.)

On November 1, 2010, state agency medical consultant Ray Conroe, Ph.D., reviewed Plaintiff's medical records and completed a psychiatric review technique form. (R. 528-40.) He considered Plaintiff's medical records, noting that Plaintiff began experiencing panic attacks after his assault in Mexico, for which he took Zoloft and Citalopram. (R. 540.) Dr. Conroe observed that Plaintiff reported feeling better in June and October 2009, and he had not been seen for mental health issues since October 2009. (R. 540.) Dr. Conroe noted that Plaintiff was primarily restricted by physical

impairments. (R. 540.) Dr. Conroe opined that Plaintiff's activities of daily living were mildly restricted, and that he had mild difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. (R. 538.) He found no episodes of decompensation. (R. 538.)

### E. Testimony at the Administrative Hearing

#### 1. Plaintiff's Testimony

At the hearing on June 18, 2012, Plaintiff testified that he completed several years of college, studying to be an electrician. (R. 50.) He enjoyed playing poker, grilling for his family, and fishing with his children. (R. 50-51.) According to Plaintiff, he spent the day sleeping and periodically watching the news. (R. 52.) He also helped his wife wash dishes and cook small meals. (R. 51.) Plaintiff stated that he last worked full-time at Progress Castings in August 2008. (R. 52, 54.) He attributed his inability to work to the pain in his ankles, knees, and back, as well as his depression and panic attacks. (R. 52-53.) Additionally, Plaintiff stated that he had tuberous sclerosis, which affected his fingers and brain. (R. 60.) Plaintiff testified that he did not socialize much and was scared of being around too many people—tendencies that had worsened since his attack in Mexico. (R. 53.) Plaintiff reported using a cane to walk, and the pain in his legs being a six or seven on a ten-point scale. (R. 57, 59.) To alleviate the pain and swelling in his legs, Plaintiff reported taking ibuprofen, elevating his legs on the couch, and icing them. (R. 53.) For his panic attacks, Plaintiff stated that he sometimes went to the emergency room, where medical staff would give him "something to settle [him] down" or he would try to relax on his own. (R. 56-57.) Plaintiff testified that he last went to the emergency

room for a panic attack in 2011, but experienced his most recent panic attack in April

2012.  (R. 56.)

### 2.    Medical Expert's Testimony

A medical expert, Joseph Horozaniecki, M.D., whose focus was occupational

medicine and emergency medicine, testified as well.  (R. 68.)  He stated that Plaintiff

suffered from the following physical impairments: chronic pain with weight bearing both

lower extremities, fractures of the right and left ankles, persistent bilateral knee pain,

degenerative joint disease, and right tibia fracture.  (R. 60).  Dr. Horozaniecki also noted

Plaintiff's plantar fasciitis, peroneal tendonitis, obesity, obstructive sleep apnea, tuberous

sclerosis, non-severe diabetes, and chronic low back pain.  (R. 61.)  He opined that none

of these impairments met or equaled a medically listed impairment.  (R. 61.)  Work

activity was limited as follows: sedentary level of exertion, no climbing of ladders,

scaffolds, working from unprotected heights or exposure to work place hazards and only

occasional bending, crouching, or stooping, no foot pedal manipulation, and no

requirement to elevate the legs.  (R. 61.)

### 3.    Vocational Expert's Testimony

Next, an impartial vocational expert, William Villa, testified.  The ALJ asked

Mr. Villa to assume a hypothetical forty-two year old individual with a GED-plus

education, suffering from plantar fasciitis, sleep apnea, obesity, depression, post-

traumatic stress disorder, tuberous sclerosis, chronic pain due to multiple fractures,

degenerative joint disease, non-severe early diabetes, and non-severe right elbow

epicondylitis.  (R. 69.)  The ALJ specified that this hypothetical individual was limited to

15

lifting and carrying ten pounds occasionally and five pounds frequently; could do sedentary work but was limited to occasional bending, stooping, crouching, crawling, twisting, and climbing; could not do heights, ladders, scaffolding, dangerous or hazardous equipment; could work in an unskilled to low-level semi-skilled job; could work with brief and superficial contact with others and no requirement for rapid pace or high production goals.  (R. 69.)  Mr. Villa opined that such a person could not do any of Plaintiff's past relevant work, but could perform other jobs in the regional or national economy, such as sedentary unskilled surveillance system monitoring, sedentary unskilled optical accessory polishing, and sedentary unskilled printed circuit touch-up fill inspector.  (R. 70.)

The ALJ then modified the hypothetical individual to one who could not maintain persistence and pace on a regular basis, and needed to be absent from the workplace more than two days per month.  (R. 70).  Mr. Villa opined that there was no work available for such an individual in the regional or national economy.  (R. 70).

Plaintiff's counsel then asked Mr. Villa if the same hypothetical individual could perform any job if he also required hourly scheduled breaks of ten to fifteen minutes each, and Mr. Villa answered in the negative.  (R. 71.)  Mr. Villa gave the same response to additional hypotheticals in which the individual needed to elevate his legs at least thirty degrees due to pain and swelling, and would be off-task 25% of the time due to his psychological and physical symptoms.  (R. 71.)

### F.    Post-Hearing Evidence

On September 2, 2012, Michael Lace, Psy. D., completed a medical interrogatory

16

about Plaintiff's mental impairments.  (R. 814-22.)  Dr. Lace found evidence of major

depression and post-traumatic stress disorder, and some evidence of panic attacks.

(R. 814.)  Dr. Lace opined that although Plaintiff's condition was severe, it did not meet

any mental health listings.  (R. 815.)  Dr. Lace found mild restriction of Plaintiff's

activities of daily living; moderate difficulties in maintaining social function and

maintaining concentration, persistence, or pace; and no repeated episodes of

decompensation, each of extended duration.  (R. 815.)  Additionally, Plaintiff was limited

to routine, repetitive tasks in a low-stress setting, and to brief and superficial contact with

supervisors, co-workers, and the general public.  (R. 818.)  In evaluating the disability

file, Dr. Lace discounted Dr. Gosen's consultative examination because she completed it

after meeting with Plaintiff once.  (R. 815.)  He also discounted Dr. Kossman's

consultative examination because it was based largely on Plaintiff's self-report and

suggested possible exaggeration of symptoms in specific circumstances.  (R. 815.)

Dr. Lace further noted that there had been no psychiatric hospitalizations or significant

ongoing psychotherapy.  (R. 815.)

On September 25, 2012, Dr. Gosen sent a supplementary letter to Plaintiff's

counsel.  (R. 826-27.)  She noted that after meeting with Plaintiff a second time on

August 9, 2012, she found his ability to interact with others extremely limited, and that he

had difficulties following instructions and carrying out plans.  (R. 826.)  She believed that

he had recurrent major depression and post-traumatic stress disorder, and that Plaintiff

had been disabled since 2008.  (R. 826.)

### G.     The ALJ's Findings and Decision

On October 25, 2012, the ALJ determined that Plaintiff was disabled under the

Social Security Act from August 23, 2008 through August 24, 2009.  (R. 19.)  The ALJ

also found, however, that Plaintiff's disability ended on August 25, 2009 due to medical

improvement relating to his ability to work, and Plaintiff had been able to perform

substantial gainful activity from that date through the date of the ALJ's decision.  (R. 19.)

Following the sequential evaluation process for disability determinations,

20 C.F.R. §§ 404.1520(a), 416.920(a), the ALJ first determined that Plaintiff had not

engaged in substantial gainful activity since August 23, 2008, the alleged onset of

disability.  (R. 22.)  Next, the ALJ found that Plaintiff had the severe impairments of

depressive disorder, diabetes mellitus, left plantar fasciitis, morbid obesity, posttraumatic

stress disorder with some panic features, and status post bilateral ankle open reduction

internal fixation.  (R. 22.)  At the third step, the ALJ relied on the opinions of

Dr. Horozaniecki and Dr. Lace to conclude that none of Plaintiff's impairments,

individually or in combination, met or equaled a listed impairment in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  (R. 24-25.)

Next, the ALJ found that from August 23, 2008, through August 24, 2009,

Plaintiff had the RFC to

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)
> except occasional bending, climbing, crawling, crouching, and twisting; no
> heights, ladders, scaffolds, or dangerous or hazardous equipment or
> machinery; unskilled-to-low level semi-skilled job; brief and superficial
> contact with others; no requirement for rapid pace or high production goals
> (i.e., fast assembly or timed piece work); and would be absent more than
> twice per month[sic].

18

(R. 25.)  The ALJ based her conclusion on medical evidence showing that during this time period, Plaintiff was non-weight bearing for several months and attended multiple medical appointments and physical therapy sessions per month.  (R. 28.)  The ALJ further reduced Plaintiff's RFC to unskilled-to-low level, semi-skilled jobs involving brief and superficial contact with others, and no rapid pace or high production goals due to his mental impairments.  (R. 28.)

At step four, the ALJ determined that from August 23, 2008, through August 24, 2009, Plaintiff could not perform any past relevant work as a deboner, general laborer, grinder, and ham trimmer.  (R. 28.)  At step five, the ALJ found that from August 23, 2008, to August 24, 2009, there were no jobs existing in significant numbers in the national economy that Plaintiff could have performed, considering his age, education, work experience, and RFC.  (R. 28-29.)  Therefore, the ALJ concluded that Plaintiff was under a disability, as defined by the Social Security Act, from August 23, 2008, through August 24, 2009.  (R. 29.)

Next, the ALJ observed that since August 25, 2009, Plaintiff developed the new impairment of low back pain.  (R. 29.)  The ALJ acknowledged that the development of the low back pain worsened Plaintiff's knee and ankle impairments.  (R. 30.)  Nonetheless, she found that the combined effect of these impairments did not meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 30.)  The ALJ also determined that medical improvement occurred as of August 25, 2009, because the record showed that by late August 2009, Plaintiff was weightbearing and no longer

attending multiple medical appointments and physical therapy sessions per month.

(R. 30.)  Consequently, the ALJ found that beginning August 25, 2009, Plainitff's RFC

had increased

> to perform sedentary work as defined in 20 CFR 404.1567(a) and
> 416.967(a) except occasional bending, climbing, crawling, crouching, and
> twisting; no heights, ladders, scaffolds, or dangerous or hazardous
> equipment or machinery; unskilled-to-low level semi-skilled job; brief and
> superficial contact with others; and no requirement for rapid pace or high
> production goals (i.e., fast assembly or timed piecework).

(R. 30.)  In making this determination, the ALJ reviewed the medical records and

opinions of Dr. Horozaniecki, Dr. Lace, Dr. Gosen, Dr. Shaman, and Dr. Kossman.

(R. 34-36.)

The ALJ considered Plaintiff's physical ailments.  Her review of the medical

record showed that Plaintiff sought "very little medical treatment" for his ankle and foot

pain after the summer of 2009; Plaintiff had a "stable, unassisted walk with no evidence

of foot drop or knee buckling"; and Plaintiff acknowledged in early 2012 that his walking

tolerance is twenty minutes and standing "does not bother him nearly as much."  (R. 31.)

As for his lumbar strains and musculoskeletal back pain, the ALJ observed that Plaintiff

underwent a short course of chiropractic care in the spring of 2011 and returned for

treatment in early 2012.  (R. 31.)  Conservative treatment was prescribed, and within a

short time of starting physical therapy, Plaintiff acknowledged his pain had improved by

75%, and he had difficulty only with prolonged walking.  (R. 31.)  The ALJ also noted

that Plaintiff had not followed through on wearing his customized orthotics, doing his at-

home stretching and strengthening exercises, losing weight, or improving conditioning.

(R. 32.)

With respect to mental impairments, the ALJ found the medical record did not support Plaintiff's allegations of debilitating depression and anxiety. (R. 32.) She noted Plaintiff's statement on October 28, 2009, that he had fewer panic attacks and his "agoraphobia was almost cleared up"; and at a follow-up appointment one year later, Plaintiff stated that his last anxiety attack was in September 2010. (R. 32.) The ALJ recognized that Plaintiff was prescribed Celexa in October 2009, and Effexor was added to his treatment regimen in November 2010 when Plaintiff reported significant anxiety and passive suicidal ideation because of his perceived inability to work. (R. 32.) The ALJ noted that there was no further mention of Plaintiff's mental health until February 2012, when Plaintiff reported significant depression and anxiety due to his lack of employment and his father's health. (R. 32-33.) The ALJ observed that Plaintiff saw a psychiatrist for the first time in July 2012, at which time his mental status was found to be normal except for withdrawn behavior. (R. 33.)

Next, the ALJ considered the opinion evidence. (R. 34-37.) The ALJ placed great weight on the opinions of neutral medical experts Dr. Horozaniecki and Dr. Lace. (R. 34.) The ALJ, however, placed little weight on the opinion of Dr. Gosen, because July 2, 2012, was the first time Plaintiff saw Dr. Gosen, and she lacked access to his medical record, instead relying on his subjective complaints and reports. (R. 34-35.) With respect to Dr. Shaman, the ALJ gave no weight to his opinion that the severity of Plaintiff's depression and anxiety met or equaled a listed impairment because it was beyond his area of expertise and unsupported by the medical record. (R. 35.) The ALJ

gave little weight to Dr. Shaman's opinion that Plaintiff would be off-task 25% of the time, incapable of even low-stress work because of depression and pain, and would miss more than four days of work per month, because it was unsupported by or inconsistent with the medical record and Plaintiff's conservative treatment since August 25, 2009. (R. 36.)  With respect to Dr. Kossman, the ALJ placed limited weight on his opinion because it indicated a greater level of limitation than the medical record showed.  (*Id.*) Limited weight was also placed on the findings of the state agency consultants because additional evidence was submitted since their last review of the record.  (*Id.*)

Based on her review of the record and the vocational expert's testimony, the ALJ concluded that Plaintiff had been unable to perform his past relevant work since August 25, 2009.  (R. 37.)  She determined, however, that Plaintiff could perform other jobs existing in significant numbers in the national economy, such as optical assembly polishing, printed circuit touch-out film inspection, and surveillance system monitoring. (R. 38.)

## III.    Discussion

### A.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision.  42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)).  The Court must examine "evidence that detracts

from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).  The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome, or even if the Court would have granted benefits.  *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).  If it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the Commissioner, the Court must affirm the decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

### B.     Plaintiff's Claims

Plaintiff argues that: (1) the ALJ failed to give appropriate weight to the opinions of Dr. Shaman, Dr. Gosen, and Dr. Kossman, and instead, incorrectly relied on the opinion of Dr. Lace; (2) substantial evidence does not support the ALJ's finding that Plaintiff's physical and mental impairments did not meet or equal a listed impairment; and (3) substantial evidence does not support the ALJ's finding that Plaintiff attained "medical improvement" as of August 25, 2009.

### 1.     Weight Given to Doctors' Opinions

#### a.     Dr. Shaman

Plaintiff argues that the ALJ failed to give adequate weight to the opinion of his treating physician, Dr. Shaman, that the severity of Plaintiff's depression and anxiety met or equaled Listings 12.04 and 12.06.  The ALJ placed no weight on this opinion, because it was beyond Dr. Shaman's area of expertise as a family medicine provider, and the medical record did not support marked limitations in mental functioning or repeated periods of decompensation, each of extended duration.  (R. 35.)

"[A] treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009).  "A treating physician's opinion does not automatically control, since the record must be evaluated as a whole." *Id.*  "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.*

Upon reviewing the record and the ALJ's reasoning, the Court concludes that the ALJ did not err.  First, the ALJ's decision not to place any weight on Dr. Shaman's opinion because it was beyond his area of expertise is consistent with the regulations. 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").  Plaintiff argues that the "diagnosis and management of depression is within the scope of practice of primary care physicians." (Pl.'s Summ. J. Mot. at 14 [Doc. No. 12].)  But courts have rejected this very argument, noting that it "amounts to nothing more than a dislike of the ALJ's phraseology," and the regulations instruct the ALJ to consider a doctor's specialty when weighing that opinion. *William v. Astrue*, No. 1:11-cv-00390, 2013 WL 228199, at *11 (N.D. Ind. Jan. 22, 2013).

Second, the ALJ properly gave no weight to Dr. Shaman's opinion because it conflicted with his treatment notes.  Dr. Shaman's records show that in October 2009,

Plaintiff reported having far fewer panic attacks, and his agoraphobia was almost gone. (R. 417.)  In October and November 2010, the records show that Dr. Shaman increased the dosage of Citalopram and prescribed Venlafaxine for Plaintiff's anxiety attacks and depression.  (R. 551-52, 556.)  There are no further medical records from Dr. Shaman until February 14, 2012, when Plaintiff reported his worsening depression and his dosage of Venlafaxine was increased.  (R. 647.)  Plaintiff last reported his depression to Dr. Shaman on March 20, 2012, for which Dr. Shaman did not change any medications but referred Plaintiff to a psychiatrist.  (R. 618-19.)  Dr. Shaman's own treatment notes do not support his opinion that Plaintiff had marked limitations in mental functioning or repeated periods of decompensation.

### b.      Dr. Gosen

Next, Plaintiff disputes the little weight that the ALJ placed on the opinions of the treating psychiatrist, Dr. Gosen.  The ALJ placed little weight on her opinions because:

- Dr. Gosen relied on Plaintiff's subjective complaints and reports;

- Dr. Gosen completed the mental impairment questionnaire based on her initial interview of Plaintiff the day earlier;

- Plaintiff's visit with Dr. Gosen was the first time he received treatment from a trained mental health provider; and

- Dr. Gosen's notes from Plaintiff's July 2, 2012, visit regarding his mental status were contrary to her responses on the mental impairment questionnaire.

(R. 34-35.)

Such weighing of Dr. Gosen's opinions was proper.  When Dr. Gosen completed the mental impairment questionnaire, she had met with Plaintiff only once.  "Generally,

the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."  20 C.F.R. § 416.927(c)(2)(i); *see Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) (declining to give doctor's opinion controlling weight because at the time it was completed, the doctor had met with the claimant on three prior occasions).

Additionally, Dr. Gosen's final report appears to be largely based on Plaintiff's own account of his impairments, and her opinions are at odds with the objective evidence in the record.  *See Letson v. Astrue*, 648 F. Supp. 2d 1101, 1117 (E.D. Mo. 2009) ("[E]ven a treating physician's conclusion may be accorded little weight where it is based heavily on a claimant's subjective complaints and is at odds with the weight of objective evidence.").  As discussed earlier, the objective evidence shows that Plaintiff reported having far fewer panic attacks in October 2009, was prescribed medication in October 2010, did not visit Dr. Shaman (or anyone else) about his depression again until February 2012, and was not referred to a psychiatrist until March 2012.  And, Dr. Shaman's treatment notes throughout that period never identified any functional limitations for Plaintiff.

Finally, Dr. Gosen's observations about Plaintiff's mental status are at odds with her own statements in the mental impairment questionnaire.  For example, Dr. Gosen's final report stated that Plaintiff was alert and oriented to person, place, and time, and Plaintiff had intact memory and intellectual functioning, concrete abstract reasoning, coherent thought process, and age-appropriate judgment.  (R. 810.)  Meanwhile, Dr. Gosen opined in the mental impairment questionnaire that Plaintiff had the following

functional limitations: extreme restriction of activities of daily living; extreme difficulties in maintaining social functioning; extreme deficiencies of concentration, persistence, or pace; and four or more repeated episodes of decompensation within a twelve-month period, each of extended duration.  (R. 803.)

Accordingly, the ALJ did not err in giving Dr. Gosen's opinions little weight.

### c.     Dr. Kossman

Plaintiff contests the limited weight that the ALJ placed on Dr. Kossman's opinion.  The ALJ stated that he accorded Dr. Kossman's opinion limited weight because, although it was generally consistent with the totality of the record evidence, it indicated a greater level of limitation than Plaintiff actually exhibited, and it was not consistent with mental status exams that detected few abnormalities.  (R. 36.)  The ALJ also noted that Plaintiff was not receiving any mental health treatment at the time of Dr. Kossman's opinion.  (R. 36.)

The Court finds that the ALJ did not err with respect to Dr. Kossman's opinion. Plaintiff takes issue with the ALJ's statement that Plaintiff was not receiving any mental health treatment at the time of his visit with Dr. Kossman, because Dr. Shaman was then treating him for depression and anxiety.  The ALJ, however, was aware of this fact, noting in her opinion that between November 2010 and February 2012, Plaintiff was taking prescriptions for depression and anxiety.  (R. 32-33.)  And, the ALJ correctly noted the absence of medical records regarding Plaintiff's mental health during this time period.  The regulations provide that the ALJ should consider the type of treatment that the claimant receives when evaluating subjective complaints.  *See* 20 C.F.R. §§ 404.1529,

416.929.  The ALJ did just that, and Plaintiff's argument is not persuasive.

Additionally, Dr. Kossman's opinion was inconsistent with Dr. Gosen's mental status exam, which showed that Plaintiff was alert and oriented, had appropriate appearance and attitude, and showed coherent thought process, intact functioning, and age-appropriate judgment.  (R. 810.)  Indeed, Dr. Kossman's own mental status examination of Plaintiff found, among other things, that he was oriented, had no apparent difficulty comprehending the interview questions, gave reasonable responses to questions concerning his social judgment and safety understanding, denied current suicidal ideation and injurious behavior, and had good judgment, decision-making ability, and impulse control.  (R. 573.)

For these reasons, the Court concludes that the ALJ did not err in giving Dr. Kossman's opinion little weight.

### d.    Dr. Lace

Plaintiff argues that the ALJ erred in according Dr. Lace's opinion great weight. The ALJ explained that he placed great weight on Dr. Lace's opinion because he was able to review all of Plaintiff's medical reports before offering his opinion; the opinion was consistent with the totality of the evidence; and Dr. Lace was an expert regarding the disability process.  (R. 34.)

"The regulations specifically provide that the opinions of non-treating physicians may be considered."  *Hacker v. Barnhart*, 459 F.3d 934, 939 (8th Cir. 2006) (citing 20 C.F.R. § 404.1527(f)).  Moreover, ALJs are not obliged to defer to treating physicians' medical opinions unless they are "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in the record." *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008).

For the reasons discussed earlier, the weight the ALJ accorded to the opinions of the treating physicians was proper.  The remaining medical opinions on Plaintiff's mental impairments are those of the non-examining medical consultants, Dr. Conroe and Dr. Boyd.  In November 2010, Dr. Conroe opined that Plaintiff's activities of daily living were mildly restricted; that he had mild difficulties in maintaining social functioning and maintaining concentration, persistence, or pace; and that there were no episodes of decompensation, each of extended duration.  (R. 538.)  In so concluding, Dr. Conroe noted that Plaintiff reported feeling better in June and October 2009, and had not been seen for mental health issues since October 2009.  (R. 540.)  In March 2011, Dr. Boyd opined that Plaintiff's daily living activities were mildly restricted; that he had mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration.  (R. 593.)  Dr. Boyd concluded that Plaintiff had the RFC to perform routine, repetitive, and 3-4 step uncomplicated instructions, handle brief and superficial contact with co-workers and the public, and cope with reasonably supportive supervisory styles. (R. 599.)  Dr. Boyd reached these conclusions after considering all evidence in the record and finding Plaintiff only partially credible about his symptoms and their effect on his functioning.  (R. 599.)  Dr. Lace's opinion—finding that Plaintiff's depression, post-traumatic stress disorder, and potential panic attacks were severe but did not meet any mental health listings—was consistent with the opinions of Dr. Conroe and Dr. Boyd and

the treatment notes as a whole.  Thus, the ALJ did not err in placing great weight on

Dr. Lace's opinion.

### 2.     Whether Plaintiff's Impairments Met or Equaled a Listing

Plaintiff argues that the ALJ erred by not concluding that he met or equaled a

listed impairment at step three with respect to his depression and anxiety.[4]  Namely, he

takes issue with the ALJ's reliance on her own review of the medical record and on the

opinion of the neutral medical examiner, rather than on the opinions of Dr. Shaman,

Dr. Gosen, and Dr. Kossman.

For Plaintiff to meet or equal Listings 12.04 or 12.06, his impairments must result

in at least two of the following: (1) marked restriction of activities of daily living;

(2) marked difficulties in maintaining social functioning; (3) marked difficulties in

maintaining concentration, persistence, or pace; or (4) repeated episodes of

decompensation, each of extended duration.  20 C.F.R. Pt. 404, Subpt. P, App. 1

§§ 12.04(B), 12.06(B).  "Marked" means "more than moderate but less than extreme."

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C).  "A marked limitation may arise when

several activities or functions are impaired, or even when only one is impaired, as long as

the degree of limitation is such as to interfere seriously with your ability to function

independently, appropriately, effectively, and on a sustained basis."  *Id.*

The ALJ found that Plaintiff had mild restriction in activities of daily living;

---

[4]  Plaintiff does not specify which medical listing he believes his impairments meet or
equal.  The Court considers Listings 12.04 and 12.06, in light of Dr. Shaman's opinion
that Plaintiff's depression and anxiety met or equaled Listings 12.04 or 12.06.  (R. 772.)

moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration. (R. 24.) The Court finds substantial evidence in the record to support this conclusion.

Regarding the first limitation, the record shows that Plaintiff did not have marked restriction in activities of daily living. As Plaintiff testified at the June 18, 2012, hearing, he spent the day sleeping and periodically watching the news, and helped his wife wash dishes and cook small meals. (R. 51-52.) And in a function report dated October 3, 2010, Plaintiff stated that his activities included maintaining his personal hygiene, eating meals, helping his wife make supper, watching television, and helping his children with homework. (R. 188.) These activities are consistent with the ALJ's finding of mild restriction in activities of daily living.

Regarding the second limitation, the record shows that Plaintiff did not have marked difficulties in maintaining social functioning. Although Plaintiff testified that he did not socialize much and was scared of being around too many people (R. 53), Dr. Kossman described Plaintiff's demeanor as cooperative and pleasant, and Plaintiff reasonably answered questions designed to test his social judgment. (R. 573). Also, the record does not show Plaintiff's inability to communicate with or interact with his treatment providers. The Court therefore finds substantial evidence that any limitation on Plaintiff's ability to maintain social functioning was no more than moderate.

Regarding the third limitation, the record shows that Plaintiff did not have marked difficulties in maintaining concentration, persistence, or pace. In February 2011,

31

Dr. Kossman noted that Plaintiff discussed his present circumstances openly and directly, was a good historian, and had no trouble remembering details about historical events in his life. (R. 569.) Likewise, in July 2012, Dr. Gosen found Plaintiff's thought process coherent, attention and concentration good, memory intact with ability to recall details of personal history, intellectual functioning intact, and abstract reasoning concrete. (R. 810.) These records provide substantial support for the ALJ's conclusion that Plaintiff did not experience marked difficulties with maintaining concentration, persistence, or pace.

Finally, regarding the fourth limitation, the record does not indicate that Plaintiff experienced repeated episodes of decompensation, each of extended duration, caused by his mental impairments. Episodes of decompensation are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(4). These episodes may be inferred from "medical records showing significant alteration in medication," "documentation of the need for a more structured psychological support system (*e.g.*, hospitalizations, placement in a halfway house, or a highly structured and directing household)," or "other relevant information in the record about the existence, severity, and duration of the episode." *Id.* The term "repeated episodes of decompensation, each of extended duration" means three episodes within one year, or an average of once every four months, each lasting for at least two weeks. *Id.* The treatment notes do not show significant alteration in medication, and

Plaintiff denied any psychiatric hospitalization.  Moreover, the Court has not found any

evidence of repeated episodes of decompensation, each of extended duration, as this term

is defined.  Thus, the ALJ's conclusion that there were no such episodes finds substantial

support in the record.

For all of these reasons, the ALJ correctly found that Plaintiff's mental

impairments do not meet or equal a listed impairment.

### 3.    Whether Plaintiff Attained "Medical Improvement" as of August 25, 2009

"Medical improvement" is defined as "any decrease in the medical severity of

your impairment(s) which was present at the time of the most recent favorable medical

decision that you were disabled or continued to be disabled."  20 C.F.R.

§ 404.1594(b)(1).  "The decision concerning whether or not an individual's condition has

improved is primarily a factual inquiry, which so often depends upon the credibility to be

given to the various witnesses, a responsibility particularly given to the trier of fact."

*Nelson v. Sullivan*, 946 F.2d 1314, 1316 (8th Cir. 1991).  Consequently, if substantial

evidence supports the ALJ's position, it must be upheld.  *Id.*

The ALJ found that medical improvement occurred as of August 25, 2009,

explaining that the "medical record clearly shows that by late August 2009 the claimant

was weightbearing and no longer attending multiple medical appointment[s] and/or

physical therapy sessions per month."[5]  (R. 30.)  Plaintiff disagrees, arguing that:

---

[5]  The Court notes that the ALJ provided only this explanation in support of her finding
of medical improvement.  The ALJ, however, provided additional citations to the medical
record in the section addressing Plaintiff's RFC beginning August 25, 2009, which

(1) he continued with medical appointments for his depression and anxiety; (2) his development of low back pain since August 25, 2009, worsened his other impairments; and (3) the ALJ failed to explain the significance of the August 25, 2009, date.

The Court concludes that the ALJ has not supported her finding of medical improvement as of August 25, 2009, with substantial evidence in the record.  First, substantial evidence does not support the ALJ's explanation, because the records cited by the ALJ show that at least between February 21, 2011, and April 5, 2011, Plaintiff underwent eleven treatments of conservative chiropractic and physical therapy.  (R. 31-32, 699.)  Plaintiff underwent physical therapy between March 14, 2012, and April 26, 2012, as well.  (R. 766.)

Second, the ALJ did not explain the significance of the August 25, 2009, date to Plaintiff's supposed medical improvement.  *See Burress v. Apfel*, 141 F. 3d 875, 879-80 (8th Cir. 1998) (remanding case where the ALJ did not specifically identify or otherwise explain the significance of the alleged date of medical improvement).  Regarding the medical records cited by the ALJ for Plaintiff's ankle and foot pain, these documents are from 2010 and 2012.  (R. 31, 643, 647, 684, 806.)  For the medical records cited by the ALJ for Plaintiff's lumbar strain and back pain, a few are from 2001 and 2005 (R. 31-32, 714, 752, 746), and most are from 2011 and 2012.  (R. 31-32, 636, 644, 699, 760, 766, 770).  Regarding the medical records cited by the ALJ for Plaintiff's hypertension and diabetes, these documents are from November 18, 2009 and the years 2010 and 2012.

---

incidentally show Plaintiff's medical improvement for one or more impairments.  (R. 30-33.)  The Court reviewed those citations as well.

(R. 32, 420, 606, 642, 647-48, 652, 670, 675.)  For the medical records cited by the ALJ

for Plaintiff's depression and anxiety, one is from October 28, 2009, and the remaining

documents are from 2010 and 2012.  (R. 32-33, 647, 649, 670-71, 675-76, 762, 805-12.)

While some of the medical records show that medical improvement occurred for one or

more impairments, none demonstrates that medical improvement occurred specifically as

of August 25, 2009.

     Third, the Court notes the ALJ's finding that Plaintiff developed the new

impairment of low back pain since August 25, 2009.  (R. 29.)  Such a finding is

potentially inconsistent with the ALJ's conclusion that medical improvement occurred as

of August 25, 2009.

     For these reasons, the ALJ's decision that medical improvement occurred as of

August 25, 2009, is not supported by substantial evidence in the record.  The Court

therefore recommends remanding this case for consideration of (a) the date on which

medical improvement occurred, and with respect to which impairments, and (b) whether

and, if so, to what extent Plaintiff became disabled again after medical improvement

occurred.

## IV.   RECOMMENDATION

     Based on the foregoing and all of the files, records, and proceedings herein, **IT IS**

**RECOMMENDED THAT**:

    1.    Plaintiff's Motion for Summary Judgment [Doc. No. 11] be **GRANTED IN PART** and **DENIED IN PART**;

    2.    Defendant's Motion for Summary Judgment [Doc. No. 18] be **GRANTED IN PART** and **DENIED IN PART**; and

3.       This case be **REMANDED** to the Commissioner to determine (a) the date
         on which medical improvement occurred, and with respect to which
         impairments, and (b) whether, and if so, to what extent Plaintiff became
         disabled again after medical improvement occurred.


Dated:  January 5, 2015                    s/  *Hildy Bowbeer*
                                           HILDY BOWBEER
                                           United States Magistrate Judge


## NOTICE

Under D. Minn. LR 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**January 23, 2015**, a writing that specifically identifies those portions of this Report to
which objections are made and the basis of those objections.  Failure to comply with this
procedure may operate as a forfeiture of the objecting party's right to seek review in the
Court of Appeals.  A party may respond to the objecting party's brief within fourteen
days after service thereof.  A judge shall make a *de novo* determination of those portions
to which objection is made.  This Report and Recommendation does not constitute an
order or judgment of the District Court, and it is therefore not appealable to the Court of
Appeals.